## Arthur B. SAUNDERS et al
## *v.* CITY OF LITTLE ROCK

77-103                                             556 S.W. 2d 874

Opinion delivered October 3, 1977
(In Banc)
[Rehearing denied November 21, 1977.]

*Purtle, Osterloh & Weber*, by: *John I. Purtle*, for appellants.

*Rose, Nash, Williamson, Carroll, Clay & Giroir*, and *Joseph C. Kemp* and *Riddick Riffel*, for appellee.

CONLEY BYRD, Justice. Appellants, Arthur B. Saunders, et al appeal from an order of the circuit court upholding the annexation of 55 square miles of territory to the City of Little Rock. Appellants, while conceding that a portion of the 55 square miles is subject to annexation, contend that some five to ten thousand acres of mining lands and some 12 square miles of flood lands do not qualify for annexation to the City of Little Rock within the meaning of Ark. Stat. Ann. § 19-307.1 (Supp. 1975), which provides:

> "Any municipality may by vote of two-thirds of the total number of members making up its governing body adopt an ordinance to annex lands contiguous to said municipality, provided the lands are either (1) platted and held for sale or use as municipal lots; (2) whether platted or not, if the lands are held to be sold as suburban property; (3) when the lands furnish the abode for a densely settled community, or represent the actual growth of the municipality beyond its legal boundary; (4) when the lands are needed for any proper municipal purposes such as for the extension of needed police regulation; or (5) when they are valuable by reason of their adaptability for prospective municipal uses."

The facts are virtually undisputed. Everybody that testified on the subject acknowledged that the mining lands were reserved by the owners for mining purposes — *i.e.*, after annexation it will remain as vacant mining land. During oral argument the City of Little Rock candidly admitted that the mining lands did not fall into items 1, 2 or 3 of the statute, *supra*, for annexation purposes. The City insists that the mining lands qualify under items 4 and 5 of the statute, *supra*, for purposes of annexation. In its brief the City refers to the following testimony of Mr. C. V. Barnes, to-wit:

> "A. Well, the city is interested in regulating and controlling mining for several reasons. One is that in a mining area, that area should be principally devoted to that

activity, it should be reserved for the activity and currently, there is no control there and as a result there has been residential development, one of which was mentioned by others today in testimony, pop up in the middle of the mining area.

Q. What happens when that occurs?

A. Well, I can tell you the status it is in right now, they are both in bankruptcy.

Q. So no one gains?

A. No one gains, that's right, because you've got depressed property so what is there that generated ad valorem taxes is affected, certainly the developer doesn't gain because he doesn't have a viable development and the people who may have purchased the property in the development unknowingly certainly have suffered a major loss.

Q. Do you forsee residential development will deteriorate and become sub-standard?

A. That would be the natural tendency.

Q. Thus becoming a burden on the local government?

A. Becoming a burden on whatever development is in that addition, yes sir. Now, by the same token, people in the mining industry or business are just as concerned because of what single family residential development in the area affects their outfit, so it's a two way street."

Likewise, with the flood lands the facts are virtually undisputed. No subdividing is permitted below the 100 year flood elevation now and if annexed to the City, the City will prevent any building below the 100 year flood elevation. No construction or fill would be permitted in the floodway proper by the City. The City itself has no plans for draining the flood lands but like everybody else is relying upon the U.S. Army Corps of Engineers. The Corps of Engineers has devised a number of plans for flood control, one of which has

been adopted by the City but nobody is in a position to predict when and if any action will be taken. Even under the Corps of Engineers' plan a substantial portion of the flood plains will remain below the flood stage that could only be used by the City for urban recreational use. The testimony of Mr. C. V. Barnes, an expert witness called by the City on the prospect of channelling Fourche Creek is as follows:

"A. Well, of course, remember you had about a four fingered question and we started to work on finger number one which we never did get down to the other three or four fingers. Remember this, that at some point in time, and you, I think asked me to explain to you what would happen at some time in the future, at some point in time, Fourche is going to be channelized and the Corps of Engineers will, or some other agency, will determine what the width of that channel is, but that channel will be fairly narrow compared to the flood plain as shown on this exhibit four, Plaintiff's Exhibit 3, beg your pardon, so when that time comes, the area outside that channelization in all probability will be reclaimed and used. Now, the definition of value, as it's been explained to me in the books, I don't know whether Webster says this, is the present worth of future benefits, so when things, in other words, that's the way people look at land is what I do today based on what I get tomorrow.

Q. That would be valuable in that sense by reason of their assessability to streams in the area.

A. Well, you know there's no reason in my mind to assume that the people in Little Rock are more backward or less progressive than the people in Dallas, Texas. Now, it all gets to be when. I can't answer that and I will admit that it is speculative because I can't answer it, but at some point in time, maybe in my life time, maybe not, something is going to happen to Fourche Creek and you are going to see Fourche Creek bottoms which you are so concerned about now as the flood plain, having potential for development just like as happened in Dallas and it's also been my observation over 50 odd years of making them, that if you want to

see what's going to happen in Little Rock, Arkansas ten or twenty years from now, you go look and see what's happening in a community that is now the size of what Little Rock will be based on that growth that's going to take place in the intervening time."

Dwight Linkous, a member of the board of directors for the City of Little Rock, testified that the City had obligated itself to pay $75,000 over a three year period to some professional consultants, "Booze-Allen-Hamilton," to make a study concerning the orderly growth of the City of Little Rock. Those consultants had recommended that the flood plains and mining areas be excepted from the City.

We agree with the City that to annex lands a municipality "must show that the lands to be annexed meet one of the five criteria set out in the first paragraph of the statute." Furthermore, we note that the statutory criteria is taken almost verbatim from *Vestal* v. *Little Rock,* 54 Ark. 321 (1891). With respect to annexation of lands by a municipality, in *Vestal* v. *Little Rock, supra,* we said:

". . . [W]e will state what we conclude from the many authorities to be the correct rule to guide in determining an application for annexation.

1. That city limits may reasonably and properly be extended so as to take in contiguous lands, (1) when they are platted and held for sale or use as town lots, (2) whether platted or not, if they are held to be brought on the market and sold as town property when they reach a value corresponding with the views of the owner, (3) when they furnish the abode for a densely-settled community, or represent the actual growth of the town beyond its legal boundary, (4) when they are needed for any proper town purpose, as for the extension of its streets or sewer, gas or water system, or to supply places for the abode or business of its residents of for the extension of needed police regulation, and (5) when they are valuable by reason of their adaptability for prospective town uses; but the mere fact that their value is enhanced by reason of their nearness to the corporation, would not give ground for their annexation, if it did not appear

that such value was enhanced on account of their adaptability to town use.

2. We conclude further that city limits should not be so extended as to take in contiguous lands, (1) when they are used only for purposes of agriculture or horticulture, and are valuable on account of such use, (2) when they are vacant and do not derive special value from their adaptability for city uses."

The annexation of lands for purposes of taxation only is prohibited by the Constitution of Arkansas, Art. 2 § 22 and Art. 2 § 23. See *Waldrop, Collector* v. *Kansas City Southern Railway Company,* 131 Ark. 453, 199 S.W. 369 (1917), *Arnold* v. *McCarroll,* 200 Ark. 1094, 143 S.W. 2d 35 (1940), *Town of Ouita* v. *Heidgen,* 247 Ark. 943, 448 S.W. 2d 631 (1970) and *Parrish* v. *City of Russellville,* 253 Ark. 1000, 490 S.W. 2d 126 (1973). In the last mentioned case, we stated:

"Furthermore, as recently as *Town of Ouita* v. *Heidgen,* 247 Ark. 943, 448 S.W. 2d 631 (1970), (involving some of these same lands), we pointed out that where it is manifested that the owners of land taken into a city can derive no benefits from being placed within the incorporated limits, such action amounts to the taking of private property for public use in the form of taxation without giving any compensation."

Other courts are in accord. See *City of Olivette* v. *Grasler,* (Mo.) 369 S.W. 2d 85 (1963).

While there is testimony that the City is using one or two abandoned bauxite pits for a dump, this cannot tolerably be said to constitute substantial evidence that the whole mining area — somewhere between 7.8 and 15.6 square miles — is adaptable to "prospective municipal uses." This is especially so, when the City admits that the area is reserved by the owners for mining purposes only and that if the annexation is upheld, the City intends to zone the whole area for mining purposes. Furthermore, since the City acknowledges that the area is vacant, not held for use as municipal lots or to be sold for urban uses and that the same use will be made of the lands for mining purposes after annexation as before annexa-

tion, we fail to see how the City can logically contend that the lands "are needed for any proper municipal purpose such as the extension of needed police regulation." The testimony of Mr. Barnes upon which the City relies falls far short of showing that the lands are adaptable for prospective municipal uses under item (5) of the statute, *supra*. To say that mining lands, already reserved and being used for mining purposes, should be zoned for mining purposes only, cannot be said to be substantial evidence that the lands "are needed for any proper municipal purposes such as for the extension of needed police regulation." A city's desire to zone vacant lands outside a city that do not derive a special value from their adaptability for city uses is not a needed police regulation for any proper municipal purpose, *Vestal* v. *Little Rock, supra* — otherwise the only limitation on annexation would be the state's boundaries.

Since the erroneous inclusion of the mining lands voids the annexation in toto, *City of Little Rock* v. *Findley,* 224 Ark. 305, 272 S.W. 2d 823 (1954), it is not necessary for us to give a full discussion to the issue involving the flood plains. However, we point out that, on the record before us, the annexation of the total 12 square mile area is highly questionable in view of the following facts: (1) The lands in general cannot be subdivided or otherwise adapted to city purposes until Fourche Creek is channelized; (2) the channelization of Fourche Creek is acknowledged by the City's expert witness, Mr. Barnes, to be speculative; (3) even after channelization of Fourche Creek there will remain a substantial acreage unsuitable for any city purpose or use other than a faint suggestion that they could be used for urban recreation — a use for which the City has no plans and no funds with which to acquire the lands.

Reversed and dismissed.

GEORGE ROSE SMITH and HICKMAN, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. This is the second trial and appeal of essentially the same case. The first time we decided that the proposed annexation of 55 square miles by the City of Little Rock was illegal because it included some agricultural property contrary to Arkansas law.

*Arthur B. Saunders, et al* v. *City of Little Rock,* 257 Ark. 195, 515 S.W. 2d 633 (1974).

The Arkansas Legislature amended the law that caused the first annexation to be illegal. Act 298, 1971 Ark. Acts, *as amended by* Act 309 and Act 904, 1975 Ark. Acts. The City of Little Rock again proposed the same area to be annexed, the issue was submitted to the same voters and, again, it was approved. There was another trial on essentially the same issues and facts. The trial court upheld the annexation and from that decision comes this appeal.

Many of the legal arguments made in the first case were repeated in this case. The same argument was made about the Fourche Creek flood plains located in the annexed area. In fact, a major part of the evidence in both cases was whether the flood plains of the Fourche could be annexed. Previously, we did not rule on that argument or any other of the many other arguments made, but instead held the annexation illegal for only one reason — that some of the lands were used for agricultural purposes. *Arthur B. Saunders, et al* v. *City of Little Rock, supra.*

The record in this appeal, about 400 pages, is concerned mostly with the feasibility of Little Rock annexing the Fourche Creek flood plains. Again, we do not rule on this issue. At least eighteen objections to the annexation were raised at trial and only one of them mentioned that some of the land was used for mining purposes. The majority have decided that this annexation was illegal because some of the lands are "mining lands."

The majority says that there was not substantial evidence to support the inclusion of "five to ten thousand acres of mining lands." (There was no testimony offered about the size of the mining tracts or areas.) The reasoning is that it was not shown these lands could be used by the city or are needed for proper municipal purposes.

The law gives a municipality a right to annex contiguous lands if they are: (1) platted and held for sale or use as municipal lots; or, (2) platted or not, are to be sold as suburban property; or, (3) are the abode for a densely settled com-

munity or represent the actual growth of the municipality beyond its legal boundary; or, (4) are needed for any proper municipal purposes such as the extension of needed police regulations; or, (5) are valuable by reason of their adaptability for prospective municipal uses. Ark. Stat. Ann. § 19-307.1 (Supp. 1975).

The only evidence in the record about the so-called mining lands is favorable to the City of Little Rock. In addition to the testimony of C. V. Barnes, quoted in the majority opinion, about the development of residential and mining properties in the same area, there was other testimony. Mr. Jim Finch, the city planner, testified:

> . . . The mining areas, as it has been stated here again several times, present an economic resource for the community and state as a whole. But there have been to our knowledge, encroachments into prime mining areas and there have been mining encroachments up to residential areas. The plans again, that the city has might only be reflected in that we have several times worked on the development of land use regulations for mining areas that would protect the mining interest and would protect residential interest and mining areas. We do not have those adopted simply because it is not really an issue not being in the city. The city has expressed an obvious interest in some of that area through the use of those old mining pits for the landfill sites to help reclaim the land.

He went on further to state:

> . . . The residents in this area propose, the residents propose obviously to make certain use of their property now either in the mining area, flood plain or whatever and, in order to protect and encourage orderly growth in those areas, to see that transportation networks and utility networks, things of that nature are extended in an orderly fashion, compatible kinds of uses develop that you don't have single family areas developing right in the middle of the areas where they are doing heavy mining and blasting and other kinds of industrial activities and to see that residential development does not en-

croach into prime mining areas would seem to be an interest of the city of Little Rock in as much as the mining interest does represent a substantial economic interest for the city.

Mr. Dwight Linkous testified:

> . . . The bauxite pits as we know there were presently used as a land fill site and we are negotiating for another one. The property is being restored to a much more highly cost per acre and return to the owner than it would have been if it were not used for these purposes. I can see potential in the usage of all of the areas even the worse flood plain areas of Fourche Creek.

Mr. J. William Perry, the executive vice president of the Little Rock Chamber of Commerce, testified that in his opinion the city needed the additional 55 square miles to attract industry to the area. This testimony was in addition to the testimony of the Chief of Police and the Chief of the Fire Department of the City of Little Rock that it was necessary to annex all of this contiguous area to provide for the efficient and proper administration of their departments.

These statements, uncontradicted by any other evidence, are offered in conjunction with other evidence that the entire 55 square miles should be included because the city is growing in that direction and the land is best suited for urban development.

The argument is presented on appeal that the trial court improperly found that the mining lands could have a valid municipal use or could be used for a city purpose. To uphold this argument despite the evidence in the record is to hold that mining lands *per se* cannot be annexed. The same could be true of any business such as a service station or grocery store. These businesses would not necessarily have to qualify as platted, suburban or densely settled lands. It could depend on where they are located. Any business, mining or otherwise, adjacent to a growing city could be annexed legally under either provision (4) or (5) of the Arkansas law.

The majority, in effect, is holding that the city must

bypass certain lands and create numerous pockets around which the city will grow. Although the majority alludes simply to "five or ten thousand acres of mining land," there is no instruction given to the parties whether this includes any and all mining land listed on certain exhibits; whether that would include land that is held subject to an oil and gas lease; whether the mining land is in one block or fifty; or whether it is five or ten thousand acres.

Not only does the majority fail to identify the lands to be excluded, it also fails to answer other issues raised. The majority indicates that the annexation of the Fourche flood plains, if it comes before us again for the third time, would be illegal; however, it does not say so. I must take issue with the majority's failure to rule on all the issues before the court in the previous suit and in this suit. The parties have been put to a great deal of expense and trouble in this case and are entitled to specific directions from the court.

The majority opinion ignores the fact that the City of Little Rock is a growing city and that, if anything, the annexation proposal is conservative. The evidence in the case is overwhelming that the city will offer full services to all the annexed area and that the property is needed within the corporate city limits for an orderly growth of the area.

The majority opinion fails to recognize that zoning is a valid municipal purpose that is desirable in most instances and protects all property owners against haphazard development of land.

The record contains a good example of how an area should not develop. The Rodney Parham Road area near the City of Little Rock was not annexed in time, and according to the testimony, has become a "nightmare" to city officials who *have to* cure the traffic, development and congestion ills that still exist in that area.

It may be that the majority has an aversion to annexation and zoning. These powers can be abused but there is no evidence in this record that Little Rock has abused or intends to abuse its powers. There is no evidence in the record, although the majority infers otherwise, that the City of Little

Rock is annexing lands simply to gain revenue. The evidence, viewed as a whole, shows that the city has a plan for the orderly growth of its corporate limits consistent with the actual growth and the annexation will benefit all of the property owners in the area annexed.

There is not a shred of credible evidence in the record as to why the contiguous mining interests should not be annexed. Not a single owner of a mining interest testified during this trial. The majority mentions a study which recommended against including the flood plains and mining lands. However, that study was not a part of the record and normally the majority does not base its decisions on hearsay evidence not before it.

In summary, I can find no legal justification for the decision of the majority. I would affirm the case.